UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CREDIT ACCEPTANCE CORPORATION,      :

                         Plaintiff,      :      Civil Action
                                         No. _____

      v.      :

MAURA T. HEALEY, in her official capacity  :
as Attorney General of the Commonwealth of
Massachusetts,      :

                     Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

        Plaintiff Credit Acceptance Corporation ("Credit Acceptance" or the "Company")

brings this action against Defendant Maura T. Healey, in her official capacity as Attorney

General of the Commonwealth of Massachusetts (the "Attorney General"), and alleges, upon

knowledge as to itself and its own acts and upon information and belief as to all other matters, as

follows:

## NATURE OF THE ACTION

      1.     This action arises out of the Attorney General's threatened enforcement of an

unconstitutional Massachusetts regulation that deprives Credit Acceptance of the right to free

speech guaranteed by the First Amendment of the United States Constitution.

      2.     In particular, the Attorney General has implemented, and now threatens to

enforce, a regulation that imposes severe, speaker-based and content-based limitations on the

ability of creditors such as Credit Acceptance to attempt to communicate with their customers.

      3.     Under the Massachusetts Debt Collection Regulations, 940 C.M.R. §§ 7.00 *et seq.*

(the "MDCR"), implemented by the Attorney General pursuant to M.G.L. c. 93A, § 2(c),

creditors are prohibited from, among other things, attempting to communicate with their customers via telephone more than twice per seven-day period. *See* 940 C.M.R. § 7.04(1)(f) (the "Regulation").

4.      The Regulation applies not only to actual contact with a customer, but also to unsuccessful attempts to reach a customer.

5.      Creditors' ability to reasonably communicate with their customers is essential to helping customers bring their accounts current and minimizing the risk of repossession. By reaching a customer who is unable to make payments, a creditor such as Credit Acceptance is able to ascertain the customer's situation and work out payment arrangements.

6.      The Attorney General's threatened enforcement action in connection with the Regulation has required Credit Acceptance to reduce its attempts to contact customers, which has impeded its ability to communicate with its customers and work out payment arrangements when their accounts are past due. As a direct consequence of its inability to reach its customers, Credit Acceptance has been left with no reasonable option but to repossess certain customers' vehicles, and customers' payments have decreased and repossessions have increased as a result of the Regulation.

7.      The Regulation is an unconstitutional speaker-based and content-based restriction on speech because (i) it is both overinclusive and underinclusive and (ii) content-neutral alternatives are available.

8.      The Attorney General has threatened to enforce the Regulation against Credit Acceptance and seeks to subject the Company to a variety of penalties authorized by the Massachusetts law. *See* M.G.L. c. 93A, § 4.

9.     Accordingly, Credit Acceptance seeks a declaration that the Regulation is unconstitutional, and an injunction restraining the Attorney General from enforcing it.

10.     Credit Acceptance's request for relief is necessary to prevent it from being subjected to an enforcement action by the Attorney General based on purported violations of an unconstitutional state law, and to safeguard the First Amendment rights of itself and other creditors across Massachusetts.

## PARTIES

11.     Plaintiff Credit Acceptance is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business located in Southfield, Michigan.

12.     Defendant Maura Healey, sued in her official capacity only, is the Attorney General of the Commonwealth of Massachusetts.  In her official capacity, the Attorney General is charged with implementing and enforcing the law challenged in this action.  In that role, the Attorney General serves as the chief lawyer and law enforcement officer of Massachusetts.  *See* M.G.L. c. 93A, §§ 2(c), 4.

## JURISDICTION AND VENUE

13.     Because this action arises under the Constitution of the United States, this Court has jurisdiction under 28 U.S.C. § 1331.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the Attorney General, who is sued in her official capacity only, works in this District, and because a substantial part of the events giving rise to this action occurred in this District.

15.     The requested relief is authorized pursuant to 28 U.S.C. §§ 2201 and 2202 because there is a present and actual controversy between the parties of sufficient immediacy and reality to warrant the issuance of a declaratory judgment and an injunction.  In particular, the

Attorney General has threatened to sue Credit Acceptance for purported past violations of the Regulation, and Credit Acceptance has curtailed its constitutionally-protected speech because it reasonably fears that the Attorney General will commence such an enforcement action.

## FACTUAL BACKGROUND

### A.     Credit Acceptance's Business

16.     Since 1972, Credit Acceptance has offered a finance program that allows approved car dealerships ("Dealers") to sell vehicles on credit to consumers, regardless of a customer's credit history.

17.     The Company operates exclusively in the indirect auto finance market, and accepts assignment of retail installment sales contracts ("Contracts") entered into between Dealers and consumers for the purchase of a vehicle.  Credit Acceptance does not directly make loans to consumers or service loans originated by others.  Nor does the Company purchase Contracts from, or sell Contracts to, any other finance company, servicer or lender.

18.     Once Credit Acceptance accepts assignment of a Contract from a Dealer, it administers, services and collects the amounts due from the customer.

19.     With Credit Acceptance's financing programs, a significant number of customers can obtain financing for their vehicle purchases and potentially improve their credit scores, inasmuch as Credit Acceptance reports to the three national credit reporting agencies.  This allows some customers to later qualify for more traditional forms of financing.

20.     Credit Acceptance currently maintains relationships with over 11,000 customers in connection with Contracts originated in Massachusetts for which Credit Acceptance has accepted assignment.

21.     Throughout the life of the Contracts the Company services, Credit Acceptance attempts to communicate with customers for numerous reasons, including to discuss missed

payments and/or past due amounts.  These communications are important to bringing a

customer's account current and minimizing the risk of repossession.  If a customer is unable to

make a payment, the Company's outreach provides an opportunity for the customer to discuss

potential arrangements and/or commit to making a payment.  The customers then have various

options that permit them to continue to drive the vehicle, and thus avoid the potentially

significant social and economic disruptions that may follow from the loss of transportation, such

as loss of employment.

**B.    Statutory and Regulatory Framework**

22.    Massachusetts's consumer protection statute prohibits "[u]nfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

M.G.L. c. 93A, § 2(a).  The Attorney General is authorized to "make rules and regulations

interpreting the provisions of" M.G.L. c. 93A, § 2(a).  *Id.* § 2(c).

23.    Pursuant to that authority, the Attorney General promulgated the MDCR, which

the Attorney General amended on March 2, 2012.  As relevant here, the amended regulations

provide:

> It shall constitute an unfair or deceptive act or practice for a creditor to contact a
> debtor in any of the following ways:
>
> . . . .
>
> (f)   Initiating a communication with any debtor via telephone, either in
> person or via text messaging or recorded audio message, in excess of two
> such communications in each seven-day period to either the debtor's
> residence, cellular telephone, or other telephone number provided by the
> debtor as his or her personal telephone number and two such
> communications in each 30-day period other than at a debtor's residence,
> cellular telephone, or other telephone number provided by the debtor as
> his or her personal telephone number, for each debt . . . .

940 C.M.R. § 7.04(1)(f).

24.     The MDCR defines "creditor" as "any person and his or her agents, servants, employees, or attorneys engaged in collecting a debt owed or alleged to be owed to him or her by a debtor . . . ." *Id.* § 7.03.  A "debtor" is defined as "a natural person, or his or her guardian, administrator or executor, present or residing in Massachusetts who is allegedly personally liable for a debt."  *Id.*  "Debt" is defined as "money or its equivalent which is, or is alleged to be, more than 30 days past due and owing, unless a different period is agreed to by the debtor . . . ."  *Id.*

25.     "Communication" is defined as "conveying information directly or indirectly to any person through any medium excluding non-identifying communications."  *Id.*[1]

26.     On January 24, 2013, the Attorney General issued guidance concerning the amended MDCR.  *See* Mass. Office of the Att'y Gen., *Guidance with Respect to Debt Collection Regulations* (Jan. 24, 2013) (the "2013 Guidance").[2]  With respect to the Regulation, the 2013 Guidance provides:

"Initiating a Communication" Under 940 CMR 7.04(1)(f)

> According to the [revised debt collection regulations], creditors may not initiate a communication with a debtor via telephone more than two times in a seven day period to a debtor's home, cell, or personal telephone number.  The goal of this provision is not only ***to limit the number of times a creditor can communicate with a debtor via telephone to try to collect a debt***, but also to limit the fees that a creditor can impose on a debtor (thereby limiting voicemails and text messages to twice in a seven day period).  Accordingly, unsuccessful attempts by a creditor to reach a debtor via telephone may not constitute initiation of communication if the creditor is truly unable to reach the debtor or to leave a message for the debtor.  Notwithstanding this interpretation, the Office of the Attorney General may still consider enforcement action against any conduct,

---

[1] "Nonidentifying Communication" is defined as "any communication with any person other than the debtor in which the creditor does not convey any information except the name of the creditor and in which the creditor makes no inquiry other than to determine a convenient time and place to contact the debtor."  940 C.M.R. § 7.03.

[2] The 2013 Guidance is available at https://www.mass.gov/files/documents/2016/08/xc/debt-collection-guidance-2013.pdf.

> including initiation of communication via telephone, the natural consequence of which is to harass, oppress, or abuse a debtor.

(2013 Guidance at 1 (emphasis added).)

27.     The Massachusetts consumer protection statute authorizes the Attorney General to enforce the prohibition on unfair and deceptive practices, as provided in the statute and the regulations promulgated thereunder.  *See* M.G.L. c. 93A, § 4.  The Attorney General is authorized to seek a range of penalties for alleged violations, including civil penalties of up to $5,000 for each violation, restitution for any "ascertainable loss" a consumer experiences, and the reasonable costs of investigation and litigation, including reasonable attorney's fees.  *Id.*

28.     Prior to June 2018, courts had reached conflicting opinions as to whether the Regulation applied to *call attempts* or *actual contact* with the customer.  For example, in 2014, Judge Zobel held that unanswered calls did not constitute "communications" subject to the prohibitions contained in the Regulation.  *See Camacho v. Northland Grp.*, No. 13-CV-10773 (RWZ), 2014 WL 12586233, at *1 (D. Mass. Sept. 17, 2014); *but see Watkins v. Glenn Assocs.*, 33 Mass. L. Rptr. 368 (Super. Ct. June 10, 2016).

29.     On June 25, 2018, the Massachusetts Supreme Judicial Court held that a creditor "'initiat[es] a communication . . . via telephone' under the [Regulation] every time it attempts to contact a debtor's telephone number to convey information . . . regardless of whether the telephonic communication is live, via text message, or via recorded audio message."  *Armata v. Target Corp.*, 480 Mass. 14, 19-20 (2018) (first alteration and first ellipses in original).  The court concluded that "[t]he use of the word 'initiating' [in the Regulation] . . . indicates that a creditor need not be successful in reaching a debtor for the regulation to apply."  *Id.* at 19.

C.      **The Regulation Is Overinclusive and Has the**
        **Effect of Chilling Speech Unrelated to Collections**

30.     The Regulation imposes significant restrictions on the ability of creditors—and only creditors—to communicate with their customers in real time.  Under the interpretation provided by the Massachusetts Supreme Judicial Court, the Regulation prohibits a creditor from even attempting to reach its customers by telephone or text more than twice per seven-day period—regardless of whether contact was made.

31.     The impact of this curtailment of attempted communication with by creditors with their customers by telephone goes far beyond attempting to prevent those communications aimed at "harass[ing], oppress[ing], or abus[ing] a debtor." (2013 Guidance at 1.)  It also bars attempted communications that are intended to help customers.

32.     Creditors and their customers share an interest in the creditors being able to attempt to reach their customers to discuss a delinquent debt.  In particular, first-party creditors (in contrast to third-party debt collectors) benefit by ensuring a customer is current on payments and by collecting the debt without resorting to repossession.  When a customer has the opportunity to speak with a creditor, he or she can be made aware, in real time, of various options tailored to their particular situation.  Put simply, by maintaining the ability to reasonably communicate with customers, creditors are able to increase the likelihood that customers who are delinquent will reach a solution to help them avoid becoming further past due and get them current where possible.

33.     By contrast, placing restrictions on creditors' ability to attempt to communicate with their customers decreases the opportunities available to those customers to effectively manage repayment and maintain their financial wellness.  For example, creditors often provide workable alternative solutions to delinquent customers (and have incentives to use those

solutions), which may help the customer become current.  Use of these solutions will typically allow a customer who is already delinquent to reduce the risk of repossession.

34.     Although the Regulation does not directly limit customers' ability to initiate communication with creditors, as a practical matter, customers are unlikely to initiate communications concerning late payments.  In some circumstances, customers may be unaware that they are past due on their payments, or may not realize that initiating communication could result in a dialogue that may benefit them.

35.     Creditors attempt to communicate with their customers for a number of reasons unrelated to collections.  For example, creditors may attempt to contact their customers to alert them to possible fraud, confirm the customer's information (including his or her current address) or perform quality assurance.  These communications are restricted by the Regulation.

36.     Restrictions on creditors' ability to attempt to communicate with their customers can have significant negative consequences for the customers.  For example, a study conducted by the American Financial Services Association suggests that for borrowers entering collections (1-29 days past due), restricting the number of call attempts could increase the number of those customers who end up 90+ days past due by nearly 70% for installment loans and more than 50% for vehicle finance contracts.  *See* Am. Fin. Servs. Ass'n, *Impact of Collections Call Restrictions on Consumer Delinquencies in Vehicle Finance and Installment Lending*, at 2 (Nov. 2019) (the "AFSA Report").[3]  According to the AFSA Report, because creditors typically repossess at or around 90+ days past due, the number of repossessions would likely increase at similar rates as the increase in customers 90+ days past due.  *See id.*  In addition, even in

---

[3] The AFSA Report is available at https://www.afsaonline.org/Portals/0/11AFSA%20-%20Impact%20of%20Collections%20Call%20Restrictions%20-%20Nov%202019%20FINAL.pdf.

circumstances where repossession is ultimately avoided, the borrower may pay more interest, potentially incur late charges and suffer greater reductions in their credit scores than if they had more promptly worked out a payment arrangement with their creditor.  (*See id.*)

37.     Underscoring the overinclusive nature of the Regulation, Massachusetts law permits certain types of debt collectors, *i.e.*, third-party debt collectors, to contact debtors more than twice per week regarding an outstanding debt in certain circumstances while proscribing these same communications from creditors.  Under 209 C.M.R. § 18.14, a third-party debt collector is authorized to obtain "the prior consent of the consumer" to "engage[] [the] consumer in communication via telephone or via text messaging, initiated by the debt collector, in excess of two such communications in each seven-day period . . . ."  209 C.M.R. § 18.14(d).[4]

38.     The Regulation does not contain a similar "consent" exception for creditors and prohibits "[i]nitiating a communication with any debtor" as opposed to "engag[ing] [the] consumer in communication."  *Compare* 940 C.M.R. § 7.04(1)(f), *with* 209 C.M.R. § 18.14(d). Thus, under Massachusetts law, a third-party debt collector, whose sole basis for contacting a consumer is the collection of a debt owed to a creditor, has fewer restrictions on its ability to communicate with consumers than first-party creditors with respect to their own customers, even where first party creditors attempt to reach their customers for any of numerous reasons unrelated to the collection of debt.

---

[4] This regulation defines "debt collector" as "any person . . . who regularly collects or attempts to collect, directly or indirectly, a debt owed or due or asserted to be owed or due another."  209 C.M.R. § 18.02.

**D.    A Court in this District Enters A Temporary Restraining Order**
**Against the Attorney General's Enforcement of a Similar Debt Collection**
**Regulation As an "Unconstitutional Ban on One Form of Communication"**

39.    On March 26, 2020, the Attorney General issued 940 C.M.R. § 35.00, Unfair and

Deceptive Debt Collection Practices During the State of Emergency Caused by COVID-19 (the

"Emergency Regulation"), pursuant to M.G.L. c. 30A, §§ 2-3 and M.G.L. c. 93A, § 2.

40.    For a period of 90 days or until the expiration of the State of Emergency, the

Emergency Regulation imposed a ban on telephonic communications initiated by "debt

collectors,"[5] with consumers in connection with the payment of a debt that is due and owing, and

provided that such communications would be deemed "unfair or deceptive" acts or practices

under M.G.L. c. 93A, § 2.[6]

41.    On May 6, 2020, the Court entered a temporary restraining order enjoining the

Attorney General from enforcing the Emergency Regulation.  *See ACA Int'l v. Healey*, No. 20-

CV-10767 (RGS), 2020 WL 2198366, at *10 (D. Mass. May 6, 2020).

42.    The Court concluded that the Emergency Regulation "imposes a flat ban on a

particular medium of speech (telephonic communications) involving a particular subject matter

(the solicitation of a payment of a debt) by a particular subset of those persons (debt collectors)

who engage in that type of speech."  *Id.* at *5.  The Court held that the Attorney General failed to

---

[5] The term "debt collector" is defined to mean "any person or business whose principal purpose
is the collection of a debt, or who regularly collects or attempts to collect, directly or indirectly, a
debt owed or due or asserted to be owed or due another," as well as "any person who buys or
acquires debt that is in default at the time of purchase or acquisition and who seeks to collect
such debt."  940 C.M.R. § 35.02.  However, among other categories of persons, "a person
collecting or attempting to collect a debt owed or due or asserted to be owed or due another . . .
which was not in default at the time it was obtained by the person" is not a "debt collector" under
the Emergency Regulation.  *Id.* § 35.02(f).

[6] The term "communication" is defined in the Emergency Regulation to "share the same meaning
as defined in 940 CMR 7.03."  940 C.M.R. § 35.02.

show that the stated interest in "preserving domestic tranquility" could not be achieved "in a manner that does not restrict speech, or that restricts less speech." *Id.* at *6 (quoting *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371 (2002)).

**E.    The Regulation Has Chilled and Will Continue to Chill Credit Acceptance's Speech**

43.    The Regulation has had the effect of chilling Credit Acceptance's constitutionally protected speech.

44.    Prior to the *Armata* decision, creditors could have reasonably believed that unanswered calls were not "communications" subject to the Regulation, and, thus, not counted unanswered calls where no voicemail was left as subject to that limit.  The Company limited its calls that resulted in speaking with a Massachusetts customer to twice in a seven-day period.

45.    Immediately after the *Armata* decision, Credit Acceptance temporarily ceased all collection calls to customers located in Massachusetts.

46.    After reviewing the *Armata* decision and making the necessary conforming changes, effective September 1, 2018, the Company resumed calls to debtors pursuant to a revised, Massachusetts-specific policy.  Under that policy, Credit Acceptance has limited telephone call attempts with its customers to two communications per seven-day period, regardless of whether those attempted communications successfully reach customers.

**F.    The Attorney General Threatens Enforcement Proceedings Related to the Company's Pre-*Armata* Telephone Communications Practices**

47.    Despite Credit Acceptance's prompt compliance with *Armata*, in or around November 2017, the Attorney General requested information from the Company concerning, among other things, the frequency of the Company's Massachusetts collection calls.

48.     In connection with her investigation, which has been ongoing for almost six years, the Attorney General has alleged that Credit Acceptance violated the Regulation, and has threatened to commence enforcement litigation against the Company.

49.     But for the Regulation, the *Armata* decision and fear of enforcement by the Attorney General, Credit Acceptance would not limit itself to a maximum of two attempted telephone communications with its Massachusetts customers per seven-day period.

50.     The Company has observed the adverse consequences of the *Armata* decision on customers firsthand.  Limiting the ability of creditors to attempt to communicate with their customers has directly reduced the number of communications that Credit Acceptance had with its customers after one or more missed payments.  Such communications are essential to allow customers to make payment arrangements and find a resolution to payment issues in order to avoid negative repercussions resulting from non-payment, including repossession.  Since the *Armata* decision, repossessions on past due accounts in Massachusetts have increased.

51.     The Company more freely attempts communication with customers located in states other than Massachusetts where it is not subject to the same unconstitutional restraints on free speech.  Credit Acceptance's ability to communicate with customers located in those states directly impacts its ability to attempt to address breaches of the customers' payment obligations in ways that do not involve repossession.

## COUNT I
### (Declaratory Judgment that the Regulation Is Unconstitutional)

52.     Credit Acceptance repeats and re-alleges paragraphs 1 through 51 as though fully set forth herein.

53.     "The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const. amend. I).

54.     The First Amendment prohibits discrimination based on the content of speech or the identity of the speaker. *See Barr v. Am. Ass'n of Political Consultants, Inc*, 140 S. Ct. 2335, 2346 (2020) ("[A] government . . . 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" (citation omitted)); *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011) (holding that statute which "impose[d] a burden based on the content of speech and the identity of the speaker" was unconstitutional).

55.     Content-based and speaker-based restrictions on speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.  Heightened scrutiny (*i.e.*, strict or intermediate scrutiny) applies regardless of the type of speech at issue. *See Sorrell*, 564 U.S. at 566 ("The First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.'" (citation omitted)); *see also Am. Ass'n of Political Consultants, Inc,* 140 S. Ct. at 2347 (holding that the Telephone Consumer Protection Act's exception permitting only government debt collectors to use robocalls "is content-based [and] 'subject to strict scrutiny.'  . . . Although collecting government debt is no doubt a worthy goal, the Government concedes that it has not sufficiently justified the differentiation between government-debt collection speech and other important categories of robocall speech, such as political speech, charitable fundraising, issue advocacy, commercial advertising, and the like" (citation omitted)).  The Regulation is a speaker-based and content-based speech restriction because it "disfavors specific speakers," namely creditors, as

defined by the MDCR, and because it disfavors "speech with a particular content," *Sorrell*, 564

U.S. at 564, namely debt collection-related speech.

56.     First, the Regulation applies only to creditors.  *See* 940 C.M.R. § 7.04.

57.     Second, the Regulation "applies to particular speech because of the topic

discussed."  *Reed*, 576 U.S. at 163.  Specifically, incorporating the definition of "creditor" and

"debtor" into the Regulation, the Regulation facially disfavors communications between "any

person . . . engaged in collecting a debt owed . . . by a debtor" and "a natural person . . . present

or residing in Massachusetts who is allegedly personally liable for a debt."  940 C.M.R. § 7.03;

*see id.* § 7.04(f).

58.     The Regulation does not proscribe speech by any other types of speakers or any

other type of particular content.

59.     Under the Regulation, non-creditors, such as refinance or debt consolidation

companies, as well as advertisers of credit and credit-related services, may freely contact debtors

without restriction through any medium, while creditors to whom a debtor owes a debt can place

only two calls attempting to contact the debtor every seven days.

60.     The Regulation cannot survive strict or intermediate scrutiny because it is both

significantly overinclusive and underinclusive in advancing the purported purpose for which it

was promulgated, namely preventing the harassment of debtors.

61.     The Regulation is overinclusive because (i) there are widely available less

restrictive alternatives available to the Attorney General, and (ii) it prohibits attempted

communications that creditors do not intend to be harassing and their customers would not

reasonably consider harassing, including for myriad other reasons unrelated to debt collection.

For instance, because the Regulation prohibits *any* attempted telephonic communication by

creditors in excess of twice per seven-day period once the customer reaches a certain status (of owing "debt"), customers are deprived of important communications from creditors that may benefit those customers, such as proactive efforts to reach the customer to avoid repossession. The fact that the Regulation deprives customers of communications that may be to their benefit, in addition to efforts to attempt to collect a debt, underscores the overinclusiveness of the Regulation.  The overinclusiveness is also reflected in the fact that Massachusetts law provides fewer restrictions for third-party debt collectors, whose sole basis for contacting a consumer is the collection of a debt owed to a creditor, to communicate with debtors, as compared to first-party creditors attempting to communicate with their own customers.  209 C.M.R. § 18.14.

62.     Just as the Court in *ACA* held in enjoining enforcement of the Emergency Regulation, the Attorney General cannot show that the Regulation's stated purpose cannot be achieved "in a manner that does not restrict speech, or that restricts less speech."  *ACA*, 2020 WL 2198366, at *10 (quoting *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371 (2002)).

63.     The Regulation is underinclusive because it does not (i) proscribe communications (or attempted communications) that are actually intended to harass debtors, (ii) prohibit harassment through all available means of communication or (iii) prevent harassment of debtors by persons other than those "engaged in collecting a debt owed or alleged to be owed . . . by a debtor."  940 C.M.R. § 7.03.  Indeed, while Massachusetts law authorizes potentially unlimited communications by third-party debt collectors provided they are not intended to annoy, abuse, or harass the consumers, *see* 209 C.M.R. §§ 18.14(d), 18.15, the Regulation limits creditors' ability to attempt to communicate with consumers, but does not contain the same express prohibition on communications intended to annoy, abuse, or harass. *See Reed*, 576 U.S. at 157 ("Assuming that the Town has a compelling interest in preserving its

aesthetic appeal and traffic safety, the Code's distinctions are highly underinclusive.  The Town

cannot . . . show[] that temporary directional signs pose a greater threat to public safety than

ideological or political signs.").

64.     This underinclusiveness "raises serious doubts about whether the [Attorney

General] is in fact pursuing the interest [she] invokes . . .  rather than disfavoring a particular

speaker or viewpoint."  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011) (holding that a

California statute that prohibited the sale or rental of "violent video games" to minors violated

the First Amendment because it was underinclusive and did not preclude minors from having

access to violent information in other forms).

65.     There are speaker-neutral and content-neutral ways the Attorney General could

further the professed interest in prohibiting debtor harassment, for example, by proscribing

harassing communications irrespective of the speaker.

66.     The Regulation is an impermissible means of advancing any legitimate interest of

the Attorney General, and is, therefore, unconstitutional.

67.     For these reasons, the Regulation is improper when examined under any

applicable standard of scrutiny.

68.     An actual, present and justiciable controversy has arisen between the Attorney

General and Credit Acceptance concerning Credit Acceptance's exposure to liability from the

Attorney General's threatened claims, as well as the continued chilling effect of the Regulation

on the Company's communications (and attempted communications) with its customers.

### **REQUEST FOR RELIEF**

Credit Acceptance respectfully requests that the Court enter judgment in its favor

and against the Attorney General as follows:

A.      A permanent injunction enjoining the enforcement of the Regulation by the

Attorney General, her agents and employees against Credit Acceptance;

B.      A declaratory judgment, pursuant to 28 U.S.C. §§ 2201, 2202 and Rule 57 of the

Federal Rules of Civil Procedure, that the Regulation is unconstitutional;

C.      An order requiring that Defendant pay all costs, interest, and attorneys' fees as

may be incurred with this civil action as allowed by law; and

D.      For such other and further relief as the Court deems just and proper.


Dated: August 21, 2020                          Respectfully submitted,
       Boston, Massachusetts

                                                /s/  James R. Carroll
                                                James R. Carroll (BBO# 554426)
                                                SKADDEN, ARPS, SLATE,
                                                   MEAGHER & FLOM LLP
                                                500 Boylston Street
                                                Boston, Massachusetts 02116
                                                (617) 573-4800
                                                james.carroll@skadden.com

                                                Patrick G. Rideout (*pro hac vice* forthcoming)
                                                SKADDEN, ARPS, SLATE,
                                                   MEAGHER & FLOM LLP
                                                One Manhattan West
                                                New York, New York 10001
                                                (212) 735-3000
                                                patrick.rideout@skadden.com

                                                Anand S. Raman (*pro hac vice* forthcoming)
                                                SKADDEN, ARPS, SLATE,
                                                   MEAGHER & FLOM LLP
                                                1440 New York Avenue, N.W.
                                                Washington, D.C. 20005
                                                (202) 371-7000
                                                anand.raman@skadden.com

                                                *Counsel for Plaintiff*
                                                *Credit Acceptance Corporation*